UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JERMAINE SWABY,

                    Petitioner,

       -against-


THE PEOPLE OF THE STATE OF NEW
YORK,

                    Respondent.
-------------------------------------------------------------------x

**MEMORANDUM & ORDER**

06-CV-3845 (ENV)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 3 1 2014 ★
BROOKLYN OFFICE

BROOKLYN OFFICE

VITALIANO, D.J.

     In the early morning hours of September 30, 2001, Shane Reynolds exited a night club in Brooklyn. Moments later, Jermaine Swaby, using a firearm he was carrying illegally, shot Reynolds in the head five times, killing him. At his state court murder trial, Swaby acknowledged these facts, but claimed he acted in self defense. The jury did not buy that story, and convicted him of intentional murder.

     Swaby is now before this Court, represented by an attorney, on a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, asserting that the state court proceedings violated his Sixth Amendment right to the effective assistance of counsel.

     For the reasons set forth below, the Court finds that certain of the state court findings were unreasonable or contrary to clearly established federal law, but finds that petitioner cannot demonstrate the existence of a reasonable probability that,

1

but for defense counsel's deficient performance, the result of his trial would have been different.  In sum, the shortcomings do not upset confidence in the verdict or render the conviction constitutionally infirm.  The writ must be denied and the petition dismissed.

## Background

### A. The Case Theories

Swaby's jury trial took place in Kings County before Justice Albert Tomei[1] in May 2002.  (Transcript of Record, People v. Swaby, Indict. No. 9142/01 (Sup. Ct., Kings Cty., 2002) ("Tr.") at 1.)  The prosecutor advanced a relatively simple theory in his opening statement:  Swaby executed Reynolds outside a nightclub following an altercation that began inside the club.  The People argued that the evidence would show (1) Swaby and Reynolds knew and had issues with each other prior to the shooting; (2) Swaby, Reynolds, and others engaged in a fistfight in the early morning hours of September 30, 2001 while at Club C, a nightclub in Brooklyn; (3) bouncers threw Swaby out of the club as a result of the fight; (4) after being ejected, Swaby initially left the area of the club but returned and waited for Reynolds near the club's entrance; and (5) upon Reynolds's exit from Club C, Swaby shot him in the head multiple times.  The prosecution argued further that it would demonstrate that, shortly before Reynolds exited the club, Swaby's girlfriend, Faye Dunn yelled, "Bring him out, bring him out.  Bring that motherfucker out,"

---

[1] Because Swaby was convicted, the Court recites the facts in the light most favorable to the verdict.  See Garbutt v. Conway, 688 F.3d 79, 80 (2d Cir. 2012).

and, upon Reynolds's exit, shouted, "Shoot him, shoot him." Finally, the People explained that a bouncer at the club, Wayne Clarke, who had no connection to Swaby or Reynolds, would testify that he (1) saw Swaby exit the club and then immediately leave the area; (2) saw Reynolds leave the club shortly thereafter; (3) heard two shots fired while he stood only a few feet away from Reynolds; and (4) upon turning toward the direction from which he heard the shots come, he saw Swaby fire a second fusillade of shots toward Reynolds as he lay motionless on the ground.

Knowing that he could not contest that his client was the shooter, in the defense opening, Swaby's trial counsel, Michael Harrison, offered a confusing and rather bizarre statement. Giving counsel every benefit of the doubt, however, it does appear that he introduced a theory of self defense.

B. The People's Case

Police Officer Avis Whittle, the first witness, described the crime scene. (Tr. 38–54.) He explained that the night club's entrance was located 20 to 30 feet from a gate that was near a sidewalk running along a street lined with parked cars. Additionally, he testified that Reynolds's body was found lying on that sidewalk, with his legs directed toward the club and his head hanging off the curb, facing a nearby parked car. (Tr. 53.)

Sharaka Cuyler, Reynolds's girlfriend at the time of the shooting, testified that she went with Reynolds and others to Club C where she saw that Swaby and his

3

girlfriend, Faye Dunn (also known as "Janelle"). (Tr. 246, 341.) Cuyler told the jury that she saw a fight break out at the club that involved Swaby and Reynolds, among others. (Tr. 70–74.) When Cuyler and Reynolds attempted to exit the club, a bouncer pushed Reynolds outside, pushed Cuyler back inside, and closed the door. From inside the club, Culyer heard about six gun shots and a voice she recognized as Dunn's yelling, "Pop that nigger." (Tr. 80–81.) Soon after, Cuyler was able to get outside where she saw Reynolds lying with his head by the curb, bleeding, and trying to speak. (Tr. 84–85.) On cross examination, Harrison attempted to establish that Reynolds must have "pursued or followed" Swaby outside the club. The only testimony he was able to elicit on this point, however, was that Reynolds left the club after Swaby. (Tr. 88–89; see also 97, 99.)

The People's third witness was Jamar Carr, a friend of Reynolds. (Tr. 101–50.) Carr testified that he met Reynolds and others at the club on the night of the shooting. He stated that he saw a fight break out involving Dunn, Swaby, Reynolds and others inside the club. When Carr left the club, he saw Reynolds standing outside on the sidewalk. (Tr. 122.) He then heard Dunn say, "Pop him. Pop him," followed by one gunshot, a pause, and then four or five more shots. (Tr. 124–25.) When the shots stopped, Carr saw Reynolds lying on the sidewalk by a car, trying to speak. (Tr. 128.)

Wayne Clarke, a bouncer at the club, was the prosecutor's fourth witness. (Tr. 156–202.) He testified that, at around 4:30 A.M., he saw two men leave the

4

club. The first man, who Clarke recognized as a regular customer, said that people were fighting and that he was "getting the hell out of [t]here." The second man, who Clarke later identified as Swaby, was, at that point in time, unknown to Clarke, and said nothing. The two men left the area. (Tr. 168.)

Clarke then walked through the gate toward the club's entrance, he told the jury, to see what was going on. As he did, he heard a woman's voice yell from inside the club's entrance, "Bring him out. Bring the mother fucker out." (Tr. 169.) As the woman reached the top of a staircase leading to the club's entrance, the woman, who he later identified as Dunn, came into view. She left the area in front of the club, passing Clarke, and yelling, "I want that mother fucker. Clap him. Clap him. I want him dead." (Tr. 171.) At that point, Clarke noticed that Swaby had returned, and was sitting on a car located about five feet from the gate. Swaby said nothing to Dunn as she approached him, but he moved toward her and motioned to her by extending both arms with his palms outstretched.

At that point, Clarke "figured something was going to happen," and turned around to tell his colleagues inside. As he continued toward the club's entrance, Reynolds came out of the club, and exclaimed, "Fuck with me, son" while reaching out both of his (empty) hands. (Tr. 176.) A "split second" later, Clarke heard a gunshot. (Tr. 177.) He did not see who fired the shot, but turned toward the direction from which it had come. It was then that he saw Swaby fire a second shot at Reynolds and Reynolds fall forward, with his face landing by the curb, away

5

from Clarke. Swaby stood over Reynolds and fired four to six additional shots toward Reynolds's motionless body. Clarke, who was standing near the gate, was about seven or eight feet away from Reynolds when these last shots were fired. In fear, he retreated into the club. (Tr. 176–84.) Harrison's cross-examination of Clarke elicited no helpful testimony for the defense. (Tr. 194–202.)

The prosecution also introduced forensic evidence and related testimony. First, seven shell casings were collected at the scene, each of which was fired from the same 0.22 caliber semiautomatic gun, which, an expert testified, would fire only one bullet per trigger pull. (Tr. 211, 278, 282.) Second, Reynolds's fingerprint was found on the front passenger side window of the car parked near where he fell. (Tr. 222–25.) And third, the car's rear side window was broken. (Tr. 226.)

Finally, the People called Dr. Charles A. Catanese, the medical examiner who performed an autopsy on Reynolds. (Tr. 287–318.) He testified that Reynolds's cause of death was catastrophic head trauma resulting from five gunshots wounds to the head. Dr. Catanese further testified that Reynolds had the following injuries in addition to his bullet wounds: (1) an abrasion on the lower, right chin; (2) an abrasion and a bruise on the right side of his forehead; (3) a contusion around his right eye; (4) a laceration on his nose; (5) multiple abrasions around his right eye; (6) a linear abrasion on his left cheek; and (7) about 45 abrasions on his left hand and forearm, consistent with stippling that occurs from gun fire. (Tr. 300–05.) Finally, Dr. Catanese testified that Reynolds had a blood alcohol level of 0.06. (Tr.

306.) Again, Harrison's cross-examination did not elicit any helpful testimony for the defense. (Tr. 308–315.)

C. <u>The Defense Case</u>

Swaby was the only defense witness. According to his testimony, Swaby did not even know Reynolds prior to the night of the shooting. He testified that he carried a gun into the club because he lived in "a bad neighborhood [where] people get killed all the time." (Tr. 322.) Before that night, however, he had never fired it. He did admit, in response to a question from Harrison, that he used a knife to rob someone in the recent past, and that he pled guilty to that crime. (Tr. 322–33.) Swaby testified that on the night of the shooting he was dancing at the club when "some guy" he did not know approached him and punched him in the face for no apparent reason. Then, "quite a few" other people started hitting him as well, at which point, he left the club. As Swaby was waiting outside for Dunn, he saw Reynolds run at him with one hand behind his back. Reynolds ran into Swaby, smashing him against the car. According to Swaby, a struggle ensued. He could not run away, he said, because he was pinned against a car. Swaby's description of the altercation during his direct testimony ended with Swaby stating that he had no memory of the shooting because he "blacked out." (Tr. 332.)

On cross examination, Swaby reiterated that he could not remember the shooting at all because he closed his eyes and blacked out. (Tr. 398.) Several answers later, however, he described pulling the gun's trigger and then blacking

out. (Tr. 401.) And then, several more answers later, he noted, "I only had to pull it one time. It just went crazy, just kept going off." (Tr. 404.) Swaby explained that he was not aiming the gun in any particular direction and it was just a coincidence that all five bullets hit Reynolds in the head. (Tr. 404–05.)

There was a redirect of a sort. Harrison presented a role playing exercise in which Swaby and Harrison acted out the fight. At the start of the exercise, Harrison played Swaby and Swaby played Reynolds. Later, they switched roles. The exercise was apparently confusing to the trial judge (and, presumably, the jury), with the judge indicating that he could not determine who was playing whom. (Tr. 417.)

D. The Closing Statements

In summing up for the defense, Harrison argued that the shooting was justified on the basis of self defense. He stated that Swaby was "attacked by a group of people [inside the club] who appeared to be part of Mr. Reynolds' group or predatory gang." (Tr. 425.) He argued that forensic evidence, specifically, Reynolds's fingerprint on the car, corroborated Swaby's story that the two had been in a fight outside the club and that Reynolds had pinned Swaby against the car. (Tr. 429.) He also continually emphasized the fact that Swaby had "retreat[ed]" from the club. (See, e.g., Tr. 439.) At climax, Harrison sought to reference a David and Goliath analogy that he used in his opening statement, but the prosecutor objected and Harrison ended his summation. (Tr. 450.)

The prosecution closed emphasizing that Swaby admitted to shooting Reynolds, and argued that even if the jury believed Swaby's version of events, they should conclude that Swaby, nevertheless, was not acting in self defense. (See, e.g., Tr. 459.) The People also repeatedly pointed out that the physical evidence corroborated Clarke's version of the incident. (See, e.g., id.) The prosecutor argued, succinctly, that "the only reasonable view of the evidence is that [Swaby] murdered [] Reynolds." (Tr. 470.)

E. The Charge, Jury Deliberations, Verdict and Sentencing

The only jury instruction Harrison requested was justification, and it was provided. (Tr. 420.) Harrison declined to request any lesser-included charges, nor did the trial judge deem such instruction appropriate in his proposed charge. (Tr. 420–21.) The jury found Swaby guilty of intentional murder in the second degree under New York Penal Law § 125.25[1]. (Tr. 502.) The trial court sentenced Swaby to a term of 25 years to life imprisonment. (Sent. Tr. 15.)

F. Post Trial Proceedings

Swaby appealed his conviction to the Appellate Division, Second Department, arguing that the trial court's justification charge was erroneous. On, June 21, 2004, the Second Department held that Swaby's claim was unpreserved and, in any event, without merit. People v. Swaby, 8 A.D.3d 591, 778 N.Y.S.2d 711 (2d Dep't 2004). On August 27, 2004, New York's high court denied leave to appeal. People v. Swaby, 3 N.Y.3d 682 (2004).

On October 14, 2005, Swaby moved to vacate his conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, contending that his right to effective assistance of counsel had been violated. See People v. Swaby, Ind. No. 9142/01, Memorandum (Sup. Ct., Kings Cty., March 23, 2006). That motion was denied on March 23, 2006. Id. The Appellate Division denied leave to appeal on July 11, 2006. People v. Swaby, Ind. No. 9142/01, Dec. & Order on App. (2d Dep't 2006). Swaby's counsel for the purposes of his § 440.10 motion was Joel B. Rudin, who is also representing Swaby before this Court.

Swaby filed the instant petition for habeas corpus relief on August 9, 2006. Swaby's only claim is that his trial counsel, Harrison, was constitutionally ineffective. He offers many arguments in support of that claim.

## Legal Standards

### A. Substantive Grounds for Habeas Review

Under the Antiterroism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d); see also Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference").

AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. Harrington v. Richter, 131 S. Ct. 770, 785 (2011); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S. Ct. at 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5 (1979)). Review under AEDPA "demands that state-court decisions be given the benefit of the doubt." Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curium) (internal quotation marks omitted). Where AEDPA deference applies, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)). For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. Id. at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's

11

decisions but unreasonably applies that principle of the facts of" the case. Id. at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Id. at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). However, a federal court may reverse a state court ruling only where it was "so lacking in justification that there [is no] possibility for fairminded disagreement." Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (quoting Harrington, 131 S. Ct. at 786–87). "If this standard is difficult to meet—and it is— that is because it was meant to be." Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted). Federal courts should not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas review is the remedy." Id. (citation omitted).

Moreover, review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S. Ct. at 1398. A federal court may look beyond the state court record, however, when the petitioner can demonstrate that "the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involving an unreasonable application' of federal law." Id. at 1411 n. 20.

## B. Ineffective Assistance of Counsel

Strickland v. Washington provides the well-known, two prong framework for analyzing ineffective assistance of counsel claims. 466 U.S. 668 (1984). First, a petitioner must overcome the strong presumption that his trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" by showing that his counsel failed to act "reasonabl[y] considering all the circumstances." Pinholster, 131 S. Ct. at 1404 (quoting Strickland, 466 U.S. at 690, 688). Second, the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The "reasonable probability" standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Pinholster, 131 S. Ct. at 1404 (quoting Harrington, 131 S. Ct. at 791). Because of the inherently deferential nature of the Strickland standard, "[a] criminal defendant has a high burden to overcome to prove the [constitutional] deficiency of counsel." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006). For habeas petitioners, this burden is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006) (quoting Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003)). In other words, the benchmark for ineffective assistance claims in the habeas context is "doubly deferential" because courts take a "highly deferential look at counsel's performance through the deferential lens of

13

§ 2254(d)." <u>Pinholster</u>, 131 S. Ct. at 1403 (citations omitted). To succeed in district court on any issues where AEDPA deference is required, the petitioner will have to show "that it was necessarily unreasonable" for the state court to conclude that the petitioner did not prove his trial attorney was ineffective. <u>Id.</u> at 1404.

Discussion

A. <u>Counsel's Alleged Failure to Request Necessary Jury Instructions</u>

    1) <u>Failure to Request a Flight Charge</u>

Petitioner contends that Harrison's failure to request a flight instruction constituted ineffective assistance. (Petitioner's Memorandum of Law in Support of the Petition, filed on March 5, 2007 ("Pet. Mem."), 30–32.) The § 440.10 motion court rejected this argument after noting that the decision to request a flight instruction is a matter of trial strategy. <u>People v. Swaby</u>, Memorandum, at 13.

Under New York law, criminal defendants are entitled to a jury instruction, upon request, that evidence of flight as consciousness of guilt is of limited probative value whenever such evidence is introduced at trial. <u>People v. Yazum</u>, 13 N.Y.2d 302, 304, 246 N.Y.S.2d 626 (1963). Since it is clear that evidence of Swaby's flight was introduced at his trial (<u>see</u>, <u>e.g.</u>, Tr. 340–49, 467), it would not have been error for the trial court to give the instruction. That being so, this Court must address whether Harrison's failure to request such a charge was a reasonable trial strategy under the circumstances.

14

As courts in this circuit have observed, a flight instruction, "while pointing out to the jury the limited probative value of flight evidence, [also reveals to the jury that flight can be considered] as evidence of the defendant's own 'consciousness of guilt.'" Garcia v. Graham, No. 11-CV-0870, 2012 WL 2921624, at *10 (W.D.N.Y. July 17, 2012); see also Thompson v. Lemke, No. 08-CV-3426, 2009 WL 4110290, at *12 (E.D.N.Y. Nov. 23, 2009); Robinson v. Keane, No. 92-CV-6090, 1999 WL 459811, at *3 (S.D.N.Y. June 29, 1999). Particularly in the circumstances presented here, where the innocence of Swaby's mental state was critical to the defense case, it would be entirely reasonable for counsel to conclude that the benefits of a flight charge are far outweighed by the potential downside—disclosing to the jury the fact that flight evidence can be probative, albeit only slightly, of a defendant's guilty conscience.

Because the Court finds that petitioner has failed to show that the state court acted contrary to, or unreasonably applied, clearly established federal law in concluding that Harrison's decision not to request a flight charge was a reasonable trial strategy, petitioner's application for habeas relief on this ground is denied.

2) Failure to Request a Lesser Included Offense Instruction

Swaby next argues that Harrison was ineffective for not requesting an instruction on lesser included offenses and, more fundamentally, for failing to explain the law of lesser included offenses to him. (Pet. 9–10; Pet. Mem. 32–38.) Supreme Court, in deciding his § 440.10 motion, concluded that Swaby failed to

demonstrate that he would have been entitled to a lesser included charge, and that, even if the facts supported a lesser included offense charge, an attorney's decision to make such a request is strategic. People v. Swaby, Memorandum, at 12–13.

Under New York law, in order for a court to charge lesser included offenses, there must be a reasonable view of the evidence that would allow the jury to conclude that the defendant committed the lesser but not the greater offense. See N.Y. Crim. Proc. L. § 300.50(1); People v. Scarborough, 402 N.E.2d 1127, 1129–30 (1980); see also Colon v. Smith, 723 F. Supp. 1003, 1007–08 (S.D.N.Y. 1989). Post trial, Swaby claims that he was entitled to instructions on both manslaughter in the first degree based on an intent to cause serious physical injury, N.Y. Penal L. § 125.20[1], and manslaughter in the second degree based on recklessly causing the death of another, N.Y. Penal L. § 125.20[2]. (Pet. Mem. 33.) In any event, since the motion court concluded that there is no reasonable view of the evidence to justify either lesser included charge, its finding that counsel's decision not to request such a charge cannot be deemed ineffective assistance must stand, because its factual findings on this point are not unreasonable nor challenged by any evidence to the contrary. These findings and conclusions of the motion court are impervious to attack under AEDPA's bounds.

Moreover, even if it would have been proper as a matter of state law for the trial court to charge on the lesser included offenses in Swaby's case, as the motion court correctly observed, courts afford "substantial deference" to an attorney's

16

"tactical decision" to not request that the jury be instructed on a lesser included offense. Rios v. United States, No. 91-CV-04384, 1992 WL 328931, at *6 (E.D.N.Y. Oct. 13, 1992). Particularly in a case such as this, in which counsel is pursuing an exculpatory defense, courts have declined to find ineffective assistance of counsel, recognizing that "[t]he tactical decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial deference." Id. at *6–7; see also Hernandez v. Larkin, No. 12-CV-8090, 2013 WL 4453316, at *15 (S.D.N.Y. Aug. 19, 2013); Gibbs v. Donnelly, 673 F. Supp. 2d 121, 143 (W.D.N.Y. 2009), aff'd, 402 F. App'x 566 (2d Cir. 2010). Without a quibble, it is plain that an instruction that would give the jury an opportunity to consider a mental state other than fear would not have been helpful to Swaby's theory of self-defense.

Lastly, petitioner attempts to distinguish his case based on Harrison's alleged failure to explain the law of lesser included offenses to him. (Pet. Mem. 35–36.) In support of this argument, petitioner offers the sworn statement of his current counsel in the "Rudin Affadavit," which declares that Harrison told Rudin that he could not remember discussing lesser-included charges with Swaby. (Pet. A-5.) The record, however, does not support this contention. When the trial court asked Harrison, "[Y]ou don't want any lesser included?" Harrison responded, "I considered it with my client. The only lesser included would be extreme emotional distress." (Tr. 421–22.) The motion court, in any case, was not obligated to accept Harrison's indirectly-reported, post-conviction failure of recollection over his

17

statement on the record at trial. But, far more importantly, even if petitioner's claim that Harrison did not consult with him concerning the tactical decision not to seek a lesser included offense instruction were true, courts have concluded that this does not constitute a violation of a petitioner's rights that would entitle him to habeas relief. See Domingo v. Greiner, No. 99-CV-1906, 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) (citing Wainwright v. Sykes, 433 U.S. 72, 93 (1977)).

Because petitioner's argument cannot survive the deficient performance prong of Strickland, the motion court's decision on this claim handily withstands AEDPA review.

### 3) Failure to Request an Excessive Force Instruction

Petitioner next argues that trial counsel was ineffective for failing to request an excessive force charge. (Pet. Mem. 38–41.) In its § 440.10 decision, Supreme Court concluded that, to the contrary, trial counsel's apparent decision not to request such an instruction was a reasonable trial strategy. People v. Swaby, Memorandum, at 13–14.

New York courts have held that "[w]here homicide is charged," and there is evidence that the defendant was initially justified in using deadly force, "the People must prove that it was the excessive force which caused death." People v. Carrera, 282 A.D.2d 614, 616, 725 N.Y.S.2d 344 (2d Dep't 2001). In Swaby's case, Harrison was not ineffective in failing to request an excessive force instruction because, as petitioner himself admits (Pet. Mem. 40), there was no basis for such a request given

18

the forensic evidence and testimony presented at Swaby's trial. See <u>Cheeseboro v.</u> <u>Cunningham</u>, No. 09-CV-3262, 2012 WL 1117494, at *7 (E.D.N.Y. March 30, 2012); <u>Darden v. Conway</u>, No. 10-CV-0570, 2011 WL 3739551, at *4–6 (W.D.N.Y. Aug. 24, 2011). By force of logic, petitioner's application for habeas relief based on Harrison's failure to request an excessive force instruction, in the undisputed absence of record evidence to support such an instruction, is denied.

## B. <u>Counsel's Alleged Failure to Adequately Interview and Prepare Swaby To Testify</u>

Swaby contends that, but for a preliminary interview several months before trial, Harrison "never interviewed [him] in any detail about the shooting or [his] state of mind, never discussed [] the specifics of [his] defense, and never explained the legal principles underlying a justification defense." (Pet. Mem. 9–10.) Swaby argues that this is evidenced by (1) Harrison's introduction of an attempted extreme emotion distress ("EED") defense and related references to a sexual relationship between Reynolds and Dunn; (2) his failure to elicit the innocent reasons for Swaby's flight; (3) his failure to introduce evidence about Swaby's past exposure to violence to support the theory of self defense; and (4) his failure to prepare Swaby for an in-court demonstration of Swaby's altercation with Reynolds. The motion court examined the merits of these claims and concluded that they were contradicted by the record. <u>People v. Swaby</u>, Memorandum, at 5, 7. The court stated: "It is clear from the former defense counsel's voir dire, opening statement and questioning of the defendant during his testimony that the defendant's

19

allegation that counsel only prepared him once (a long time before he testified) is false and unworthy of belief." Id. at 5. Petitioner claims that this determination was unreasonable and contrary to clearly established federal law. (Pet. Mem. 10.)

### 1) The EED Defense and Relationship Between Reynolds and Dunn

Swaby's first parry misconstrues Harrison's opening statement and then attacks that misconstruction. Petitioner contends that Harrison argued that Swaby was acting under an extreme emotional disturbance caused by his knowledge of Reynolds's alleged impregnation of Dunn. Swaby embellishes this argument by proffering that it was presented to the jury by Harrison as a result of his failure to adequately consult with Swaby whereupon he would have discovered that, in fact, Swaby had no such knowledge. The record, however, shows, and the motion court correctly found, that the "only defense [Harrison] pursued was justification." People v. Swaby, Memorandum, at 6. Viewing the record in its entirety, Harrison's use of the Dunn-Reynolds relationship was not meant to bolster an argument that Swaby acted under emotional distress, but, rather, was a factually-supported trial strategy meant to demonstrate that Reynolds was antagonistic and intent on attacking Swaby. More to the point, the motion court's ruling to that effect was reasonable. Supreme Court's finding can only be upset by clear and convincing evidence. Petitioner offers none.

### 2) Failure to Elicit Innocent Reasons for Swaby's Flight

Next under the spotlight is the claim that Harrison failed to interview Swaby to learn the true reasons for his flight, and failed to prepare him to testify about why he fled the scene of the shooting and then avoided the police. These reasons included "his fear of the Crips gang in prison" (Swaby claimed to have believed that Reynolds was a member of that gang), "his fear of excessive force at the hands of the police," and "his fear that he would not be accorded justice once arrested." (Pet. Mem. 20–21.) The § 440.10 court concluded, generally, that "[i]t is clear from former defense counsel's voir dire, opening statement and questioning of the defendant during his testimony that the defendant's allegation that counsel only prepared him once (a long time before he testified) is false and unworthy of belief." On the issue of Swaby's alleged fear of the "Crips," the § 440.10 court reasoned that Swaby had an opportunity to bring up the fact that he knew Reynolds was in a gang, if, in fact, that was what he believed. Since he did not, the motion court determined that Swaby's claim that he believed Reynolds was in a gang was "contradicted by the record and false." People v. Swaby, Memorandum, at 5–6.

Despite petitioner's assertions, Harrison did, in fact, elicit testimony from Swaby that (1) the reason he left the crime scene was that he knew Reynolds's friends would be coming out of the club and would try to kill him if he stayed; and (2) he did not call 911 after he left the scene and, instead, threw the gun away, because he was still scared. (Tr. 407.) Swaby also explained, in response to Harrison's questioning, that he contacted a lawyer and arranged to turn himself in

to the police shortly after the shooting, but when the lawyer demanded more money, and Swaby and his family could not afford to pay him, the plan fell through. (Tr. 334–35.) Swaby explained during cross-examination that he did not want to turn himself in to the police without a lawyer because he was afraid the police would beat him up. (Tr. 348.)

Because the § 440.10 court's determination was based on its reasoned reading of the trial record, AEDPA requires deference to its determination that this claim is meritless.

### 3) Failure to Introduce Evidence About Swaby's Past Exposure to Violence

Changing the subject matter, petitioner contends that Harrison was ineffective for failing to adequately support his justification theory by discovering and introducing evidence that Swaby's prior exposure to violence provided a reasonable basis for him to believe that Reynolds posed a deadly threat. These past experiences include "Swaby's exposure to a brutal murder as a child, his having been stabbed on two occasions, the murder of one of his friends, his presence at the attempted murder of an acquaintance, his knowledge of the dangerous reputation of Club Callaloo and its environs, and his belief that Reynolds was in the deadly Crips gang." (Pet. Mem. 15.)

Under New York law, a defendant's prior exposure to violence may contribute to his subjective belief that he is facing the imminent use of deadly force against him and may provide an objective basis for him to conclude that he must use

22

deadly physical force in his self-defense. See People v. Wesley, 76 N.Y.2d 555, 559, 561 N.Y.S.2d 707 (1990). Yet, it cannot be said that defense counsel failed entirely to support the justification defense. For example, Swaby testified, in response to Harrison's questions, that he saw Reynolds "reaching for something" "behind his back" (Tr. 327, 396, 400; Pet. Mem. 18), and that Reynolds "seemed angry, may have been intoxicated, and pushed Swaby up against a car." (Pet. Mem. 18.) Moreover, Harrison questioned Swaby about why he had a gun, and Swaby testified that he carried it because he lived in a "bad neighborhood [where] people get killed all the time." (Tr. 322; Pet. Mem. 18.) Contrary to petitioner's contention, this testimony confirms that Swaby had previous experience with violence, but also that Harrison was aware of it, and used the information to Swaby's advantage at trial. In essence, Harrison chose to meld the evidence of Swaby's exposure to violence into the greater argument about justification, apparently as petitioner agrees it should have been done. The point of contention now is that Harrison should have gathered and used more violent episodes involving Swaby to leverage their contributions to Swaby's subjective belief that he needed to use deadly force against Reynolds.

Again, it is an uncontroversial argument on this record, not that Harrison omitted a strategy, but that he could have done more to support it. However, that is not the test for granting an application for a federal habeas writ. The purpose of habeas review is not to substitute and/or layer on this Court's judgment for that of defense counsel in determining the amount and type of evidence that should be

presented at trial. Counsel saw no good purpose in adding to what he had. The motion court concluded that, based on the record and a totality of the circumstances analysis, defense counsel elicited adequate evidentiary support for his justification theory, including Swaby's exposure to violence. Supreme Court's conclusion is not unreasonable, nor is it contrary to clearly established federal law. AEDPA, as a consequence, does not tolerate its set-aside.

### 4) The Physical Reenactment at Trial

Petitioner argues that Harrison's staging a physical reenactment of the confrontation between Swaby and Reynolds, without adequately preparing Swaby beforehand, rendered his assistance constitutionally ineffective. (Pet. Mem. 22.) However, even if Harrison did not prepare Swaby for the physical reenactment, the reenactment occurred on <u>redirect</u>, as the motion court correctly pointed out. <u>People v. Swaby</u>, Memorandum, at 17 n. 54. In other words, Harrison made a spur-of-the-moment, strategic decision that the reenactment was necessary to respond to what occurred during Swaby's cross-examination by the prosecutor. Such mid-trial decisions by counsel are not properly second-guessed by federal courts on habeas review. And, more importantly, the motion court's conclusion on this point was reasonable. Accordingly, petitioner's application for habeas relief in connection with the in-trial physical reenactment based on Harrison's failure to adequately interview and prepare him is denied.

### C. Counsel's Allegedly Bizarre and Harmful Comments and Conduct

In a sweeping contention, Swaby also argues that Harrison frequently undermined his defense with "bizarre and harmful" conduct. (Pet. Mem. 41.) Much of petitioner's argument focuses on Harrison's comments about the alleged relationship between Dunn and Reynolds, and is thus rejected for the same reasons the Court rejected petitioner's claim about the alleged extreme emotional distress defense. More generally, petitioner contends that Harrison's "outlandish behavior destroyed the integrity of the defense case." (Pet. Mem. 43.) Supreme Court concluded that "while some of defense counsel's behavior cannot be condoned, viewing the totality of the representation, [Swaby] was not deprived of meaningful representation or effective assistance of counsel." People v. Swaby, Memorandum, at 16.

Based on a review of the record, the motion court's determination cannot be said to be unreasonable, or contrary to clearly established federal law. For instance, this Court agrees that "taking the opening remarks as a whole and in [] context, [Harrison] communicated to the jury that the case revolved around self-defense." Id. at 7. Bluntly, petitioner does not offer evidence that Supreme Court erred in finding that Harrison effectively presented the only defense Swaby had—that he feared for his life and shot in self-defense. Petitioner's application for habeas relief

on the ground that counsel undermined his case by other inexplicable, disparate comments cannot survive AEDPA analysis.[2]

## D. Counsel's Alleged Failure to Investigate Potentially Exculpatory Leads

Next in the cross hairs of Swaby's application is counsel's failure to investigate potentially exculpatory leads. Specifically, Swaby argues that redacted police reports given to Harrison prior to trial indicate that there were two additional incident witnesses. (Pet. A-12–13.) Petitioner contends that Harrison's assistance was ineffective because he never followed up on these leads. The motion court rejected these arguments under both prongs of Strickland, reasoning that the witnesses' testimony would have been irrelevant to his justification defense. People v. Swaby, Memorandum, at 15–16. Harrison, Supreme Court contended, was neither unreasonable nor ineffective in failing to follow up because he could have made a rational judgment that the testimony would not have been useful to Swaby's case. Id.

Eyes, of course, must be kept on the prize. While this Court does not agree with the motion court that the information would have been literally "irrelevant," People v. Swaby, Memorandum, at 16, it does agree that, in the totality of the circumstances, Harrison's failure to pursue the information did not qualify as Strickland ineffectiveness. Especially in light of Swaby's own testimony, the probative value of the information at issue was, at best, nominal. Indeed,

---

[2] Moreover, even if counsel's performance was deficient, Swaby cannot demonstrate prejudice. See infra Part H.

petitioner's current argument that "it is clear that the two witnesses may have seen details of the incident beyond what was recorded in the police reports" is entirely speculative and is belied by the statements themselves. Neither gives any indication that either witness saw the shooting. In fact, one of the reports specifically indicates that the declarant did not see it. (See Pet. A-12–13.) Harrison's decision not to further investigate, though hardly a shining moment, was reasonable. More importantly, Supreme Court's rejection of this claim after testing it against both Strickland prongs, was not clearly unreasonable, nor was it contrary to federal law. Therefore, even if the state court's determination would not be that of the federal court on de novo review, it survives review under AEDPA.

E. Counsel's Alleged Failure to Object to Improper Conduct by the Prosecutor

Swaby continues his attack on Harrison's performance as constitutional counsel by zeroing in on his failure to object when the prosecutor (1) questioned petitioner about a fake driver's license he was carrying when he was arrested (Tr. 361–62), and (2) said, during his summation, that part of Swaby's testimony was "made up." (Pet. 13.) The motion court correctly concluded that whether or not to object under these circumstances is generally a matter of trial strategy. People v. Swaby, Memorandum, at 14–15; Mazique v. Ercole, No. 06-CV-1723, 2008 WL 2884370, *9 (E.D.N.Y. July 23, 2008); see also Johnson v. Conway, No. 09-CV-0095, 2011 WL 53165 (W.D.N.Y. Jan. 7, 2011). Supreme Court also correctly pointed out that "[e]ven if counsel's failure to object was error, it did not . . . prejudice the

27

defendant." People v. Swaby, Memorandum, at 15. Given the Court's review of the record, Supreme Court's conclusion on this point was reasonable and consistent with clearly established federal law.

F. Evidence of Swaby's Criminal History and Previous Bad Conduct

On direct examination, Harrison elicited testimony from Swaby that he had recently robbed someone with a knife. (Tr. 322–23.) In rejecting the ineffective assistance claim based on the elicitation of that testimony from Swaby by his own lawyer, Supreme Court reasoned that Harrison was introducing the evidence so he could control its original presentation to the jury, due to his concern that the prosecutor would otherwise elicit it on cross examination. People v. Swaby, Memorandum, at 17 n. 54. That analysis would certainly be controlling if such an inquiry would have been fair game for the prosecutor. However, the motion court appears to have failed to take into account the fact that, following a Sandoval hearing, the prosecution was precluded from eliciting any evidence of Swaby's past crimes. (Pet. Mem. 42.) Thus, unless Swaby opened the door to the introduction of such evidence on direct, past bad act evidence was inadmissible. Respondent, seemingly recognizing the state court's flawed reasoning, argues that the introduction of the knife-point robbery was an attempt by Swaby's counsel to support an argument that Swaby did not have past experience with guns. (Respondent's Memorandum of Law in Opposition, filed on January 25, 2007 ("Resp. Mem."), 21.)

The People's speculation about Harrison's thought process is not comforting. Perhaps based on circumstances not present here, where, for instance, a person has a long and consistent history of using only knives to commit crimes, it would be a sustainable strategy to offer such evidence to make it look less likely that the accused would use a gun, and, therefore, more likely that he was innocent. Clearly, Harrison's elicitation of the bad act testimony about the past knife robbery did not fit that bill. On the totality of the circumstances, at any rate, Harrison's inquiry of Swaby cannot be seen as anything other than a significant blunder—his performance on this aspect of the case cannot be described as effective assistance. The state court's ruling to the contrary was unreasonable. <u>See</u>, <u>e.g.</u>, <u>Miller v. Senkowski</u>, 268 F. Supp. 2d 296, 313 (E.D.N.Y. 2003).

Nevertheless, this blunder by Harrison does not justify the issuance of the writ for Swaby because the Court concludes that the motion court's rejection of his claim based on its complete analysis was reasonable. <u>See People v. Swaby</u>, Memorandum, at 17 n. 54 (stating that the court considered the claim "in its totality of evidence analysis" and concluded it was "improper"). Put another way, although Supreme Court did not use precise language in its opinion, from context, and its reference to the "totality of evidence analysis," the state court rejected vacatur of the conviction because it concluded that, even if Harrison's performance on this point was deficient, there was no prejudice to Swaby, and consequently, under <u>Strickland</u>, no constitutional ineffectiveness. Given the overwhelming evidence of

Swaby's guilt presented at trial, the Court finds that the state court could have reasonably concluded that there was no prejudice to Swaby as a result of this particular deficiency of trial counsel.

G. Counsel's Failure to Consult a Forensic Expert

Petitioner argues that Harrison's failure to retain an expert to challenge the People's version of the incident—specifically, Clarke's eyewitness account of the shooting—renders his performance deficient, and his assistance constitutionally ineffective. Had a defense forensic expert testified about Reynolds's wounds, petitioner submits, there would have been a substantial likelihood of a different result because the expert evidence would have both contradicted Clarke's version of the shooting, and bolstered Swaby's. Supreme Court concluded that Harrison's decision not to consult with or retain a forensic expert "was part of a reasonable, albeit, unsuccessful trial strategy." People v. Swaby, Memorandum, at 12. The question now is whether this determination was contrary to, or an unreasonable application of, federal law. Harrington, 131 S. Ct. at 790.

1) Counsel's Deficient Performance

First, Supreme Court's determination of Swaby's post-conviction § 440.10 motion was contrary to clearly established federal law because the court appears to have based its analysis of Harrison's failure to consult and/or retain an expert on the evidence presented at trial, instead of the circumstances that existed when Harrison made the decision not to investigate the forensics related to Clarke's

30

testimony. People v. Swaby, Memorandum, at 12. When determining whether an attorney's decision not to investigate was reasonable, courts must consider the circumstances that existed at the time that decision was made.[3] Rompilla v. Beard, 545 U.S. 374, 381 (2005). That the central issue in this case was whether Swaby acted in self defense would have been apparent to any competent attorney at the outset. And, whether a jury would believe Swaby's self defense claim, competent counsel would have had to have known, was clearly going to turn on whether Swaby's account of the shooting was objectively credible. Thus, in real time, at the start of defense preparation, any potential forensic evidence either supporting Swaby's version of events or somehow undercutting the prosecution's was critical to the case.

The Court cannot imagine any reasonable excuse for Harrison's failure to see the utility of an expert who could provide a favorable opinion about the most important questions surrounding the circumstances of Reynolds's death. Unquestionably, an effective defense could not be provided without such an investigation. Beyond doubt, Harrison's decision not to consult and/or retain a forensic expert was manifestly unreasonable, as was the state court's determination to the contrary.

---

[3] Hindsight, of course, can be dispositive on the second prong of Strickland. If it were to turn out that no version of the facts would support a contrary forensic opinion, the failure to investigate that opinion would not be prejudicial and counsel's performance, while deficient, would not be constitutionally ineffective.

It is true, of course, that Supreme Court also concluded in its § 440.10 decision that Harrison had acted reasonably in not investigating the retention of a forensic expert to impeach Clarke because he wanted to avoid damaging Clarke's credibility, since part of Clarke's testimony was helpful to Swaby's theory of self defense. People v. Swaby, Memorandum, at 12. While the strategic decisions of counsel, such as whether and to what extent to cross-examine a prosecution witness, made after a full investigation, are virtually unchallengeable, no deference is owed to strategic decisions made after a less than complete investigation. Harris v. Artuz, 288 F. Supp. 2d 247, 259–60 (E.D.N.Y. 2003), aff'd, 100 F. App'x 56 (2d Cir. 2004); Strickland, 466 U.S. at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 690–91.

Here, Harrison did neither. Whatever help Clarke's testimony might have given to the petitioner's defense was vastly outweighed by the fact that Clarke, the only eyewitness to the shooting, testified that Swaby shot Reynolds before Reynolds even got near him, and then, after Reynolds was felled by gunfire, that Swaby shot a defenseless Reynolds in the head multiple times at close range. Clarke's testimony, indeed, was the crux of the People's case, and was almost completely in conflict with Swaby's version of events. In short, Clarke's testimony was devastating to the defense and he had to be impeached, if at all possible. Forensic evidence could have

been the ground for impeachment. It had to be pursued unless and until an adverse report ruled it out.

Accordingly, the motion court's finding that counsel acted reasonably in deciding not to investigate the forensics related to Clarke's testimony was clearly unreasonable. Even when guided by AEDPA deference, Harrison's performance on this point does not pass muster under Strickland's first prong.

### 2) Lack of Prejudice to Petitioner

Though, as detailed above, the Court finds Harrison's performance strikingly deficient, more is required to warrant federal habeas relief. Strickland's second prong steps beyond ineffective performance. Because the Court concludes that, based on the overwhelming evidence of Swaby's guilt, viewed in the totality of the circumstances, Swaby would have been convicted regardless of Harrison's deficiencies, on AEDPA review, the state court's ultimate conclusion that Harrison was not constitutionally ineffective cannot be disturbed.

Petitioner, of course, contends that prejudice is palpable. Swaby argues that had a defense expert testified about Reynolds's wounds, the testimony would have introduced a reasonable probability of a different result, both by undercutting Clarke's version of the shooting and supporting Swaby's version. Positing a hypothetical expert to offer a hypothetical contrary forensic opinion would presumably be far too speculative to meaningfully impact post-conviction relief

33

proceedings. So, to support this argument on his § 440.10 motion, Swaby presented the affidavit of Dr. Howard Adelman, a criminal pathologist. (Pet. A-7.)

Despite petitioner's contrary assessment, however, the descriptions of the five bullet wounds offered by Dr. Adelman simply do not conflict with Clarke's testimony. Clarke told the jury that two bullets were fired while Reynolds was approaching Swaby—matching the two bullets that Dr. Adelman described as having a front to back progression. (See Pet. A-8 (descriptions of bullets 1 and 3).) Clarke then testified that additional shots were fired as Reynolds was lying motionless with his head on the ground—matching the three bullets that Dr. Adelman described as travelling in the same general, left to right direction. (Id. (description of bullets 2, 4, and 5).) Unserendipitously for petitioner's argument here, Reynolds's five bullet wounds are perfectly consistent with Clarke's testimony.[4]

---

[4] Petitioner would love to brush aside the corroborative support Dr. Adelman's report would have supplied to the prosecution case by limiting focus to the contention that none of the shots could have been fired as Reynolds lay face-down on the ground. (Pet. Mem. 25.) This argument, however, is premised on a gross misconstruction of both the medical evidence and Clarke's description of the scene. First, although Dr. Adelman determined that none of the shots could have been fired as Reynolds lay face-down because no shots entered the back of his head, what Dr. Adelman and petitioner miss is that the testimony taken as a whole supports a finding that Reynolds was lying on his stomach, with his head facing to the side—that is, lying on his right cheek, rather than nose down. (Tr. 84–85, 128, 179–82.) Second, Dr. Adelman's conclusion that the fatal shot could not have been fired as Reynolds was lying on the ground because it entered through the top of his head is also contradicted by the record evidence. The fatal bullet to which Dr. Adelman refers (see Pet. A-8 (description of bullet 4)) did not enter the top of Reynolds's head as if, for example, the gun was positioned directly above Reynolds and directed straight down. Instead, that bullet entered the left-side crown of his head, and (importantly) traveled (1) left to right, (2) back to front, and (3) downward. (Tr. 297–99.) The

34

To cut to the quick, Swaby fails to demonstrate that, had Harrison called a forensic expert, indeed the very forensic expert he proffers on his habeas petition, there was a "reasonable probability that the trier of fact would have rejected the entirety [of the main prosecution witness's testimony] as not credible." Gersten v. Senkowski, 426 F.3d 588, 612 (2d Cir. 2005). Far more probable, and consistent with the testimony of all witnesses save Swaby, the expert testimony Dr. Adelman would have given if called, would have bolstered the prosecution's case. Since Swaby cannot demonstrate that he suffered prejudice from Harrison's failure to consult and/or retain a forensic expert, his application for habeas relief on this ground is denied.

## H. Aggregate Prejudice

Courts "must also analyze the cumulative effect of counsel's failure[s]" in assessing the issue of prejudice. Robles v. Lempke, No. 09-CV-2636, 2012 WL 5507303, at *7 (E.D.N.Y. Nov. 14, 2012) (citing Lindstadt v. Keane, 239 F. 3d 191, 199, 202 (2d Cir. 2001)). In doing so, they "must keep in mind that a verdict or conclusion only weakly supported by the record is more likely to have been affected by counsel's errors," and, "[c]onversely, where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus." Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005) (citations and internal quotation marks and alterations omitted).

---

left to right progression is, like two of the other bullets, consistent with Reynolds lying on the ground, on his stomach, right-cheek down.

Here, all of the alleged instances of ineffective assistance, considered alone, have been found to be without merit. That result does not change when they are considered in the aggregate. Evidence of Swaby's guilt is overwhelming. An impartial eyewitness testified that Swaby fired multiple shots into the head of a motionless and helpless man as he lay bleeding on a curb. No forensic evidence introduced at trial, or produced by petitioner here, contradicts that account of the shooting. As a consequence, although Harrison's performance was deficient in at least two respects, including the unnecessary introduction of past bad act evidence and failure to consult with a forensic expert, his errors do not render the result of Swaby's trial unreliable or "undermine confidence in the outcome." Lindstadt, 239 F. 3d at 204; see also Henry v. Poole, 409 F.3d 48, 64 (2d Cir. 2005); Rosario v. Ercole, 601 F.3d 118, 122–28 (2d Cir. 2010). Swaby, simply, has not met his burden under Strickland's second prong with respect to aggregate prejudice. The writ cannot issue.

## I. Failure to Present Mitigating Evidence at Sentencing

Finally, petitioner claims that defense counsel was ineffective at sentencing because he consented to the sentencing proceeding even though Swaby had not been interviewed for a statutorily-required pre-sentence report (Pet. Mem. 45–46 (citing C.P.L. § 390.20)), and because he did not present any mitigating facts to the sentencing judge. On petitioner's § 440.10 motion, Supreme Court found the claim was meritless since (1) Swaby did not state important mitigating facts that Harrison

36

could or should have presented of which the sentencing judge was unaware, (2) the sentencing court was already familiar with Swaby's background through his trial testimony, and (3) Swaby made a statement at sentencing, during which he could have informed the sentencing court about important mitigating information that Harrison had failed to present. People v. Swaby, Memorandum, at 17. The motion court found, as a consequence, no reason to upset the relatively standard New York 25 years to life sentence imposed on Swaby for a murder in the second degree conviction.

Supreme Court's judgment on this point is more than reasonable; it is compelling. The Court agrees that, even if Harrison was constitutionally deficient in failing to present or re-package mitigating evidence to the sentencing court (or allow probation to do so), there was no prejudice to Swaby because the sentencing court, as the record shows, was aware of virtually all of the important facts that might arguably be viewed as the mitigating evidence that petitioner claims Harrison should have presented at sentencing. Additionally, Swaby himself had an opportunity at sentencing to make a statement to the sentencing judge, which could have, as appropriate, contained words of explanation, mitigation, and/or contrition. But, most critically, neither the record at sentencing, nor as it is supplemented on this habeas application suggests that any significant mitigating factor was omitted from the sentencing court's consideration. Yet, all of this begs the question. The issue is not whether there were opportunities missed because of trial counsel's

37

deficiencies, but, assuming that there were, is habeas relief mandated as a result? Here, it is not, because, most persuasively, petitioner does not point to, on this application, the existence of the kind of "powerful" mitigating evidence that federal courts have found results in prejudice if not presented at sentencing. See Wiggins v. Smith, 539 U.S. 510, 534 (2003). Thus, the Court finds that the state court's determination that there was no merit to Swaby's claim of ineffective assistance of trial counsel at sentencing was reasonable, and, comports with relevant Supreme Court precedent. The writ cannot stand on this ground either.

## Conclusion

For the foregoing reasons, Jermaine Swaby's petition for habeas corpus is dismissed and the writ is denied. However, the Court finds that Swaby has made a substantial showing of the denial of a constitutional right in that the performance of his trial counsel was, in part, constitutionally deficient. As a result, a certificate of appealability shall issue with respect to the Court's finding that trial counsel's (1) introduction of past bad act evidence, and (2) failure to consult with a forensic expert, did not constitute constitutionally ineffective representation. Issuance of the certificate rests on the Court's conclusion that reasonable jurists could disagree as to whether, on these grounds, Swaby's petition should have been resolved differently. See 28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).

The Clerk of Court is directed to enter judgment in favor of respondent and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 25, 2014

s/Eric N. Vitaliano

**ERIC N. VITALIANO**
**United States District Judge**